1   Elizabeth J. Cabraser (State Bar No. 83151)
    Barry R. Himmelstein (State Bar No. 157736)
2   Michael W. Sobol  (State Bar No. 194857)
    Roger N. Heller  (State Bar No. 215348)
3   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 30th Floor
4   San Francisco, CA  94111-3336
    Telephone:    (415) 956-1000
5   Facsimile:    (415) 956-1008

6   *Plaintiffs' Liaison Counsel*

7   [*Additional counsel listed on signature page*]

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12

13  In re: Chase Bank USA, N.A. "Check        MDL No. 2032
    Loan" Contract Litigation
14                                            Case No. M:09-cv-02032-MMC
                                              Case No. 3:09-cv-00348-MMC
15  _____
                                              **MASTER CLASS ACTION COMPLAINT**
16  THIS DOCUMENT APPLIES TO ALL
    ACTIONS                                   Hon. Maxine M. Chesney
17

18

19      Plaintiffs on behalf of themselves and all others similarly situated, hereby submit the

20  following class action complaint[1]  and upon personal knowledge as to their own acts and status,

21  and upon information and belief as to all other matters, allege as follows:

22                        **NATURE OF THE ACTION**

23      1.      Plaintiffs and hundreds of thousands of other consumers accepted Chase Bank's

24  ("Chase") offer to transfer the balances on loans held by other lenders to their Chase credit card

25

26  _____

27  [1] While this complaint applies to all actions, it is intended as an amendment of the operative
    complaint in the low-numbered case filed in this district, *Michael E. Moore, et al. v. Chase Bank*
28  *USA, N.A.*, Case No. 3:09-cv-00348-MMC.

1   accounts.  In return, Chase consolidated the debt into a fixed, long term loan, the material terms

2   of which would apply until the balance is paid off or the customer defaulted.

3        2.       Having obtained cardholders' business with the offer of a long term loan, and

4   having retained the consideration provided in exchange for that loan, Chase is now coercing

5   Plaintiffs and Class members out of those loans by increasing the minimum monthly payment

6   from 2% of the loan balance to 5% of the loan balance.  (By way of example, someone carrying a

7   $20,000 balance on a long term fixed rate loan will see her required minimum monthly payment

8   increase from $400 to $1000.)  Borrowers now faced with a payment that is 2.5 times the original

9   minimum monthly payment are forced to attempt to honor the new terms Chase unilaterally

10  imposed on them; agree to new, more onerous terms with Chase or another lender; or default and

11  thus trigger onerous default APRs and late fees.  Chase also unilaterally imposed a $10 monthly

12  charge on , which it has apparently refunded in response to this litigation.  In short, Chase is using

13  its superior position to breach its contracts and unlawfully deprive Plaintiffs and Class members

14  of their long term loans, the terms of which are more favorable to Plaintiffs than to Chase.

15       3.       Plaintiffs bring this lawsuit against Chase on behalf of themselves and all other

16  similarly situated consumers, alleging claims for breach the loan agreements, breach of the

17  implied covenant of good faith and fair dealing, unconscionability, unjust enrichment, violations

18  of the various states' consumer protection laws, and violations of the Truth In Lending Act,

19  15 U.S.C. § 1601 *et. seq*. ("TILA").

20                        **JURISDICTION  AND VENUE**

21       4.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

22  1640(e), and pursuant to 28 U.S.C. 1332(d), since there are at least 100 class members in the

23  proposed class, the combined claims of proposed class members exceed $5,000,000 exclusive of

24  interest and costs, and there are numerous class members who are citizens of states other than

25  Chases's state of citizenship, which is Delaware.

26       5.       This Court has personal jurisdiction over Chase because a substantial portion of

27  the wrongdoing alleged in this Complaint took place in California, Chase is authorized to do

28  business in California, Chase has sufficient minimum contacts with California, and/or Chase

- 2 -

intentionally avails itself of markets in California through the promotion, marketing and sale of credit products and services in California, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

6.      Venue is proper in this District pursuant to the June 26, 2009 Transfer Order entered by the United States Judicial Panel on Multidistrict Litigation ordering transfer to and coordination in this District.  In addition, venue is proper pursuant to 28 U.S.C. § 1391(a) because at least one plaintiff resides here, because Chase has hundreds, if not thousands, of customers in this District, because Chase receives substantial fees from consumers who hold accounts in California and in this District, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

7.      Plaintiff Michael Moore is over the age of 18 and a resident of the State of California.

8.      Plaintiff Margaret Conley is over the age of 18 and a resident of the State of California.

9.      Plaintiff Marc Zimit is over the age of 18 and a resident of the State of California.

10.     Plaintiff Melanie King is over the age of 18 and a resident of the State of California.

11.     Plaintiff Carole Lazinsky is over the age of 18 and a resident of the State of Illinois.

12.     Plaintiff Richard Reinertson is over the age of 18 and a resident of the State of Massachusetts.

13.     Plaintiff JoAnn Candelaria is over the age of 18 and a resident of the State of Montana.

14.     Plaintiff David Greenberg is over the age of 18 and a resident of the State of New Jersey.

15.     Plaintiff Peter Norman is over the age of 18 and a resident of the State of North Carolina.

16.     Plaintiff Orly Williams is over the age of 18 and a resident of the State of New Mexico.

17.     Plaintiff Jacob Kuramoto is over the age of 18 and a resident of the State of Oregon.

18.     Plaintiff Susan Francovig is over the age of 18 and a resident of the State of Oregon.

19.     Plaintiff Melissa Neumann is over the age of 18 and a resident of the State of Washington.

20.     Plaintiff Regina Smolensky is over the age of 18 and a resident of the State of Wisconsin.

21.     Plaintiff Brian Wilkinson is over the age of 18 and a resident of the State of New York.  Plaintiff Wilkinson is a Lieutenant in the United States military presently stationed in Iraq.

22.     Defendant Chase Bank USA, N.A. is a national banking association, headquartered in the State of Delaware.  Chase is a wholly-owned subsidiary of JP Morgan Chase & Co. ("JPM"), a leading global financial services firm with assets of approximately $2.3 trillion. Chase is the legal entity for JPM's credit card business. Chase is one of the largest credit card companies in the United States, with millions of credit card customers throughout the United States.

23.     Chase Issuance Trust is a Delaware statutory trust established on April 24, 2002 under the direction of Chase, as sponsor and depositor.  *See* SEC Form 424B3, Prospectus dated February 2, 2009, Chase Issuance Trust ("Chase Issuance Trust Prospectus"), p. 25.   The Trust was previously known as Bank One Issuance Trust.  *See id.*

24.     Chase owns the credit card accounts relevant to this case and the Trust owns the credit card receivables for those accounts. *See id.,* pp. 25, 26, 30, 31. The credit card receivables owned by the Trust are security for notes issued by the Trust to "CHASEseries" investors. *See id.* at title page and pp. 25, 26. Chase is also the administrator of and depositor to the Trust, as well as the servicer of the Trust credit card receivables. *See Id.,* pp. 28, 60. Chase is the sole beneficiary of the Trust and generally directs the actions of the Trust. *See id.,* p. 27. The Trust freely admits it "may be liable for certain violations of consumer protection laws that apply to the related credit card receivables. A cardholder may be entitled to assert those violations by way of set-off against his or her obligation to pay the amount of credit card receivables owing." *See id.*, p. 142. Accordingly, both Chase and the Trust are necessary parties for Plaintiff and the Class to obtain refunds, reversals, damages and or set-offs associated with the credit card accounts and receivables owned by the Defendants.

## GENERAL ALLEGATIONS

### I.     OVERVIEW OF CHASE'S DEBT CONSOLIDATION PROGRAM

25.     For years, Chase offered hundreds of thousands of customers the opportunity to transfer the balances on loans held by other lenders, such as home equity loans, auto loans or other credit card balances, to their Chase credit card accounts, where Chase would consolidate the debt into a "fixed" loan with terms that would apply "until the balance is paid off," unless the customer breached the agreement by, among other things, making a late payment. In addition to balance transfers, Chase offered to consolidate new debt through so-called credit card checks, whereby a consumer could purchase large ticket items, such as home furnishings or a family vacation, under the same basic terms, namely, a long term loan with terms fixed until the balance is paid off.

26.     A typical offer presented the customer with two options. On the one hand, the customer could accept a 0% fixed rate for a specified period of time, such as one year. After that time, the APR on the loan would increase. On the other hand, the customer could accept a loan with a higher APR, such as 3.99%, that is a "fixed APR until the balance is paid in full." *See* Exhibit A  (examples of Chase's offers).

27.     In other words, Chase proposed two methods of debt management, one for the short term, and one for the long term.  Plaintiffs and the Class are the people who selected Chase's long term debt management offer.

28.     The fixed APRs usually ranged from 1.99% to 5.99%, and the offers often encouraged consumers to take advantage of the "super-low credit" to "save by transferring balances from higher-APR accounts," "make home improvements," "take a vacation," "cover educational expenses," or simply to "write a check to yourself."  *See id.*  Chase often urged consumers that "these checks are ready to go," and not to "miss out—great rates like this don't come around every day."  *Id.*

29.     As consideration for the long term, fixed rate loans, Chase typically charged a transaction fee up to 3% of the balance transfer or check loan amount, or a specific dollar amount.

30.     In marketing the loans to consumers, Chase positioned the long term, fixed rate loans as competitive with other loans it considered similar to the long term, fixed rate loan it was offering, such as unsecured personal loans, home equity loans, and new auto loans.  To illustrate the advantage of Chase's loan program, Chase used marketing materials that incorporated charts, such as the one reproduced below:

|  | Chase Visa® | Unsecured Personal Loan | Home Equity Loan | New Auto Loan |
|---|---|---|---|---|
| **APR** | **1.99% or 5.99%** | 14.46% APR | 7.71% APR | 6.91% APR |
| **Collateral Required** | **NO** | No | No | Yes |
| **Instant Access** | **YES** | No | No | No |

*See id.*  As part of the comparison, Chase informed consumers that the unsecured personal loan APR was based on a 24-month payment term, the home equity loan APR a 60-month payment term, and the auto loan a 48-month APR payment term.  *See id.*  Chase did not disclose that under its interpretation of its offer, Chase had the option of reducing the time period of its loans by

increasing the minimum monthly payment from 2% of the balance per month to 5% per month or more, or make any other unilateral changes it sees fit.

31.     At the time Plaintiffs and others accepted Chase's offer of "fixed" loans with terms that would apply "until the balance is paid off," its underlying loan agreements required that its customers make minimum payments of 2% of the ending balance on the monthly statement. Given their prior course of dealing with Chase and consistent with the industry standard, Plaintiffs and Class members had a reasonable expectation as to the cost of the Chase loan over the life of that loan, which included a minimum monthly payment of 2% of the ending balance of the monthly statement, versus the cost of the other loans Chase used as a comparison.

32.     If a consumer failed to make the minimum payment on time, or the payment was not honored by the consumer's bank, Chase had the right to adjust the consumer's fixed APR and apply a higher rate to the remaining loan balance.  Nowhere in the solicitations presenting this long term fixed rate loans did Chase  indicate in any way that it would or could unilaterally impose a monthly or annual fee service fee, or that the low interest rate or minimum monthly payment could be increased for borrowers who are not in default.  And, while the solicitations also refer cardholders to the "Cardmember Agreement" for further details, they do not disclose, clearly, conspicuously, or otherwise, that the long term fixed rate offer may be added to, changed, or terminated at any time by Chase for any reason, including increasing or decreasing periodic finance charges, other charges, fees, credit limits or minimum payment terms apart from instances of default.

33.     Chase marketed these loans to consumers based on the low, fixed APRs that would remain in place until the balance was paid in full.  Consumers, such as Plaintiffs and Class members, attempting to organize and manage their debt obligations over the long term, accepted Chase's offer to consolidate their other higher APR debt, make large purchases, and reduce their overall cost of credit.

Inasmuch as the pre-existing Cardmember Agreements did not address the specific subject matter of the long term fixed rate loans set forth in the solicitations, when accepted the solicitations naturally and reasonably amended the material terms of the underlying Cardmember Agreement,

1    at least with respect to the balance transfers and cash advances cardholders accepted in response

2    to the solicitations.

3           34.    To Chase's Trust investors, Chase marketed the total expected yield of the

4    portfolio which was based on a very sophisticated model that included all of the pertinent data of

5    these consumers.  From this data, the model predicted the amount of funds that would flow

6    through as interest, the number of accounts that would pay off early, the amount generated by the

7    interchange rate for further transactions on the accounts, the cost of funds, the capital

8    expenditures and, most importantly, the number of accounts that would make a late payment.

9    Consumers who make a late payment are charged as much as $39 each time they are late and,

10   more importantly, they lose their fixed APR, which increases to a default rate – generally 29.99%.

11          35.    As the credit market tightened, Chase, and ultimately the Trust, responded by

12   coercing Plaintiffs and Class members into foregoing the benefit of the long term loans that Chase

13   used to solicit their business in the first place.  Chase did this by imposing a $10 monthly charge

14   (which it has apparently reversed in response to this litigation), and by increasing the minimum

15   monthly payment by 150%, an amount so large that it materially modified the terms of the fixed,

16   long term loan agreements.

17          36.    As implemented by Chase, these loans were nothing like the "unsecured personal

18   loans," "home equity loans," or "new auto loans" that Chase used as examples in its solicitations.

19   None of those fixed term loans are subject to such undisclosed, unilateral increases in the monthly

20   payment amounts; nothing in Chase's marketing materials suggested that Chase could or would

21   increase the minimum monthly payments by 150%; and nothing reflected in Chase's course of

22   dealing with Plaintiffs and Class members before November 2008 suggested a minimum monthly

23   payment of anything other than the industry standard, that is, 2% of the ending balance of a

24   monthly billing statement.

25          37.    To the extent Chase did not intend such a transaction specific amendment to the

26   Cardmember Agreements with regard to the solicitations, it has engaged in an unfair and

27   deceptive act or practice.

28

38.     To the extent Chase retained the right to change material terms of the long term fixed rate loans at any time for any reason, as it has represented to investors in CHASEseries notes (Prospectus, Feb. 2, 2009, p. 34), it has also engaged in an unfair and deceptive act or practice, as the promotional offer made by Chase did not, in fact, fully, clearly, conspicuously and in readily understood language reflect the actual commitment Chase was undertaking in the offer.

## II.     THE NOVEMBER 2008 AND JUNE 2009 CHANGE IN TERMS NOTICES

39.     In November 2008, Chase sent "notices" to hundreds of thousands of account holders notifying them of the following changes, effective January 2009, to the terms of their fixed loan agreements:

- A 150% increase of each account holder's minimum payment (i.e. the amount they need to pay each month to not be in default)—from 2% to 5% of the ending balance on their monthly statement.

- A new $10 monthly "Account Service Charge" applicable to each account holder's account.

40.     In June 2009, Chase sent notices to additional account holders notifying them of the following change to the terms of their fixed loan agreements:

- A 150% increase of each account holder's minimum payment (i.e. the amount they need to pay each month to not be in default)—from 2% to 5% of the ending balance on their monthly statement.

41.     The new terms from the November and June notices were not previously disclosed to account holders.

42.     Neither the November nor June notice provided any provision to reject or opt-out of the changed account terms.

43.     In March 2009 and after these lawsuits had been filed, Chase sent a second notice to cardholders advising that "[b]eginning April 1, 2009, we will no longer assess a $10 monthly account service charge." Chase also stated that it intended to "credit your account for any $10 monthly service charge(s) billed since January 1, 2009 along with any finance charges related" to the $10 charges.

1    **III.    THE IMPACT OF CHASE'S CHANGE IN TERMS**

2    44.    The impact of the minimum payment increase is not trivial.  Because of the nature

3    of the check loans and balance transfers, when Chase mailed the change in terms notices, many

4    class members had large account balances, some exceeding $60,000.

5    45.    Taking an example of a class member with a $20,000 account balance, her

6    minimum monthly payment would increase from $400 to $1000 in the span of a month.  Over the

7    first 12 months, taking into account principal reduction, her total payments would be $9,352.77

8    instead of $4,383.71—an increase of nearly $5,000.

9    46.    According to the 2007 U.S. Census Bureau, the average household income in the

10    United States was $55,000.  The National Bureau of Economic Research has concluded that the

11    combined federal, state and local government average marginal tax rate for most workers is

12    approximately 40% of income.  Under those averages, a family making $55,000 has a net "take

13    home" of $33,000, or a monthly net "take home" of $2,750.  If that person had a $20,000 loan

14    with Chase, prior to the change in terms, the loan would have occupied 14% of their monthly

15    budget.  At the new minimum payment requirement it would occupy 36% of their monthly

16    budget.

17    47.    When account holders under the November notice complained about the changes

18    to their accounts, Chase typically presented them with certain options to avoid the changes,

19    including: (1) pay the account balances in full immediately; or (2) agree to a new, higher, variable

20    APR of 7.99% while maintaining the 2% minimum monthly payment.

21    48.    When account holders under the June notice complained about the changes to the

22    accounts, Chase typically presented them with certain options to avoid the changes, including:

23    (1) pay the account balances in full immediately, or (2) enter Chase's "Balance Liquidation

24    Program" ("BLP").  Under the BLP, account holders maintain the 2% minimum payment, but

25    abandon the other terms of their loan and agree to a 60 month repayment term and a higher APR.

26    49.    Both options demonstrate Defendants' intent to deprive account holders of the

27    benefit of the loan agreement by coercing them into a loan with a higher interest rate that is more

28    profitable to Chase.

MASTER CLASS ACTION COMPLAINT
CASE NO. M:09-CV-02032 MMC

50.     Plaintiffs and other members of the Class suffered and/or continue to suffer harm in the form of arbitrary and/or unreasonable increases in minimum monthly payment requirements, made in bad faith with the intent and effect of preventing Plaintiffs and account holders from receiving the benefit of their bargains (i.e., a fixed rate loan that allows them to predict and manage their debt over the long term); unconscionable contract terms; and, in many if not most cases, they are forced to pay Chase more than they bargained for.  Chase and the Trust have been substantially and unjustly enriched at the expense of Plaintiffs and Class members.

51.     Moreover, the November Notice that added a $10 monthly "account service charge" stated: "Important:  Your APRs will not be impacted by these changes." That assertion was false and was made in violation of the Truth In Lending Act, 15 U.S.C. 1601 *et seq.*

52.     None of the claims for relief asserted in this controversy are subject to arbitration or any valid arbitration agreement or class action waiver.  To the extent that Chase asserts such claims are subject to an arbitration agreement or a class action waiver, Plaintiffs, on behalf of themselves and the Class, seek declaratory relief in the form of a finding that such a purported agreement is void and unenforceable as, among other things, against public policy and/or unconscionable.

**IV.     THE PLAINTIFFS' EXPERIENCES**

53.     Plaintiff Moore is, and at all relevant times was, a customer of Chase.  In or around August of 2008, Chase offered, and Mr. Moore accepted, a long term fixed rate loan, with a fixed annual rate of 2.99% until the balance is repaid in full.  The total principal amount of the long term fixed rate loan was approximately $22,500, for which Mr. Moore paid a transaction fee of approximately $199.

54.     Plaintiff Moore accepted Chase's offer because it provided long-term certainty and thus allowed him to budget his monthly expenses for years to come.

55.     Mr. Moore has fully complied with his obligations under the long term fixed rate loan, including making timely minimum monthly payments.

56.     In or around November 2008, Chase informed Mr. Moore that the minimum payment on his loans had jumped from approximately $450 to approximately $1,040 (from 2% of

1   the balance to 5%) and that Chase had assessed a $10 monthly finance fee.  When Mr. Moore

2   explained to Chase that he could not afford the increased minimum payment, Chase told him that

3   his minimum payments could be put back to 2% and the monthly service fee could be waived if

4   he (1) paid off his loan balance in full; or (2) agreed to transfer his entire loan balance to a new

5   account with a limited duration interest rate of 7.99%, with Chase having the right to increase that

6   interest rate at the end of the limited duration.  Finding the 7.99% interest rate unreasonable, Mr.

7   Moore paid the higher minimum monthly payments rather than accept a higher interest rate.

8        57.     Plaintiff Conley is, and at all relevant times was, a customer of Chase.  In the last

9   several years, Chase offered, and Ms. Conley accepted, two long term fixed rate loans, with fixed

10  annual rates of 3.99% and 4.99% until the balance is repaid in full.  The total principal amount of

11  these long term fixed rate loans was approximately $20,000, for which Ms. Conley paid

12  transaction fees.

13       58.     Plaintiff Conley accepted Chase's offer because it provided long-term certainty

14  and thus allowed her to budget her monthly expenses for years to come.

15       59.     Ms. Conley has fully complied with her obligations under the long term fixed rate

16  loan, including making timely minimum monthly payments.

17       60.     In or around January 2009, Ms. Conley discovered that the minimum payment on

18  her loans had jumped from approximately $353 to approximately $867 (from 2% of the balance

19  to 5%) and that Chase had assessed a $10 monthly finance fee.  When Ms. Conley contacted

20  Chase and explained to Chase that she could not afford the increased minimum payment, Chase

21  told her that her minimum payments could be put back to 2% and the monthly service fee could

22  be waived if she accepted a higher interest rate of 7.99%.  Finding the 7.99% interest rate

23  unreasonable, Ms. Conley decided to pay the higher minimum monthly payment.  The higher

24  minimum payment has caused, and continues to cause, Ms. Conley great hardship.  Among other

25  things, her savings have been eroded, she has been forced to defer maintenance on her home, and

26  she was not able to refinance her home as a result of the higher monthly payment.

27       61.     Plaintiff Zimet is, and at all relevant times was, a customer of Chase.  In or around

28  2008, Chase offered, and Mr. Zimet accepted, a long term fixed rate loan, with a fixed annual rate

- 12 -

of 3.99% until the balance is repaid in full. The total principal amount of the long term fixed rate loan was approximately $60,000, for which Mr. Zimet paid a transaction fee.

62.     Plaintiff Zimet accepted Chase's offer because it provided long-term certainty and thus allowed him to budget his monthly expenses for years to come.

63.     Mr. Zimet has fully complied with his obligations under the long term fixed rate loan, including making timely minimum monthly payments.

64.     In June 2009, Chase informed Mr. Zimet that the minimum payment on his loan had jumped from approximately $1,200 to approximately $3,000 (from 2% of the balance to 5%). When Mr. Zimet explained to Chase that he could not afford the increased minimum payment, Chase told him that his minimum payments could be put back to 2% if he accepted a higher interest rate of 6% as part of the Balance Liquidation Program, which Mr. Zimit had little choice but to accept.

65.     Plaintiff King is, and at all relevant times was, a customer of Chase. In or around October 2005, Chase offered, and Ms. King accepted, multiple long term fixed rate loans, with fixed annual rates of 2.99%, 3.99 % and 4.99% until the balance is repaid in full. The total principal amount of the long term fixed rate loans was approximately $29,000, for which Ms. King paid a transaction fee of approximately $75 per transaction.

66.     Plaintiff King accepted Chase's offer because it provided long-term certainty and thus allowed her to budget her monthly expenses for years to come.

67.     Ms. King has fully complied with her obligations under the long term fixed rate loan, including making timely minimum monthly payments.

68.     In June 2009, Chase informed Ms. King that the minimum payment on her loan had jumped from approximately $589 to approximately $1442 (from 2% of the balance to 5%). When Ms. King explained to Chase that she could not afford the increased minimum payment, Chase told her that she would have to find a way to meet the new minimum payments, or alternatively, she could seek outside credit counseling. Finding the recommendation to use credit counseling unreasonable, Ms. King is attempting to meet the increased monthly minimum payment.

69.    Plaintiff Lazinsky is, and at all relevant times was, a customer of Chase.  In or around 2006, Chase offered, and Ms. Lazinsky accepted, multiple long term fixed rate loans, with fixed annual rates of 2.99 and 3.99% until the balance is repaid in full.  The total principal amount of the long term fixed rate loans was approximately $15,000, for which Ms. Lazinsky paid a transaction fee.

70.    Plaintiff Lazinsky accepted Chase's offer because it provided long-term certainty and thus allowed her to budget her monthly expenses for years to come.

71.    Ms. Lazinsky has fully complied with her obligations under the long term fixed rate loan, including making timely minimum monthly payments.

72.    In June 2009, Chase informed Ms. Lazinsky that the total minimum payment on her loans had jumped from approximately $225 to approximately $562 (from 2% of the balance to 5%).  When Ms. Lazinsky explained to Chase that she could not afford the $562 minimum payment, Chase told her that there were no options available to her other than to pay the increased minimum payment.

73.    Plaintiff Reinertson is, and at all relevant times was, a customer of Chase.  In or around 2008, Chase offered, and Mr. Reinertson accepted, a long term fixed rate loan, with a fixed annual rate of 3.99% until the balance is repaid in full.  The total principal amount of the long term fixed rate loans was approximately $31,000, for which Mr. Reinertson paid a transaction fee.

74.    Plaintiff Reinertson accepted Chase's offer because it provided long-term certainty and thus allowed him to budget his monthly expenses for years to come.

75.    Mr. Reinertson has fully complied with his obligations under the long term fixed rate loan, including making timely minimum monthly payments.

76.    In June 2009, Chase informed Mr. Reinertson that the minimum payment on his loan had jumped from approximately $500 to approximately $1250 (from 2% of the balance to 5%).  When Mr. Reinertson explained to Chase that he could not afford the increased minimum payment, Chase told him that he could attempt to transfer the balance to another lender, or

alternatively, he could meet Chase's new 5% minimum monthly payment. Mr. Reinertson is attempting to make the increased monthly minimum payment.

77.     Plaintiff Candelaria is, and at all relevant times was, a customer of Chase. In or around 2006, Chase offered, and Ms. Candelaria accepted, multiple long term fixed rate loans, with fixed annual rates averaging at 3.99% until the balance is repaid in full.  The total principal amount of the long term fixed rate loans was approximately $22,000, for which Ms. Candelaria paid transaction fees.

78.     Plaintiff Candelaria accepted Chase's offer because it provided long-term certainty and thus allowed her to budget her monthly expenses for years to come.

79.     Ms. Candelaria has fully complied with her obligations under the long term fixed rate loan, including making timely minimum monthly payments.

80.     In June 2009, Chase informed Ms. Candelaria that the minimum payment on her loan had jumped from approximately $455 to approximately $1139 (from 2% of the balance to 5%).  When Ms. Candelaria explained to Chase that she could not afford the increased minimum payment, Chase told her that her minimum payments could be put back to 2% if she accepted a higher interest rate of 6% as part of the Balance Liquidation Program.  Given that she could not afford the increased minimum monthly payment, Ms. Candelaria agreed to Chase's Balance Liquidation Program at a higher interest rate.

81.     Plaintiff Greenberg is, and at all relevant times was, a customer of Chase.  In or around 2006, Chase offered, and Mr. Greenberg accepted, multiple long term fixed rate loans, with fixed annual rates of 3.99%, 4.99% and 5.99% until the balance is repaid in full.  The total principal amount of the long term fixed rate loans was approximately $80,000, for which Mr. Greenberg paid a transaction fee of approximately $199 per transaction.

82.     Plaintiff Greenberg accepted Chase's offer because it provided long-term certainty and thus allowed him to budget his monthly expenses for years to come.

83.     Mr. Greenberg has fully complied with his obligations under the long term fixed rate loan, including making timely minimum monthly payments.

84.     In June 2009, Chase informed Mr. Greenberg that the minimum payment on his loan had jumped in total from approximately $1380 to approximately $3300 (from 2% of the balance to 5%).  When Mr. Greenberg explained to Chase that he could not afford the increased minimum payment, Chase told him that his minimum payments could be put back to 2% if he immediately paid off his balance and closed his account.  Finding the recommendation to close his account unreasonable, Mr. Greenberg used money from his retirement savings and 401(k) account to pay the balance down to zero.

85.     Plaintiff Williams is, and at all relevant times was, a customer of Chase.  In or around July 2005, Chase offered, and Ms. Williams accepted, a long term fixed rate loan, with a fixed annual rate of 2.99% until the balance is repaid in full.  The total principal amount of the long term fixed rate loan was approximately $37,500, for which Ms. Williams paid a transaction fee of approximately $50.

86.     Plaintiff accepted Chase's offer because it provided long-term certainty and thus allowed her to budget her monthly expenses for years to come.

87.     Ms. Williams has fully complied with her obligations under the long term fixed rate loan, including making timely minimum monthly payments.

88.     In or around January 2009, Ms. Williams discovered that the minimum payment on her loan had jumped from approximately $372 to approximately $915 (from 2% of the balance to 5%) and that Chase had assessed a $10 monthly finance fee.  When Ms. Williams contacted Chase and attempted to opt out of the new terms, Chase told her that she could not unless she accepted a higher interest rate of 7.99%, or alternatively, paid the loan balance in full.  Ms. Williams decided to pay the higher minimum monthly payments rather than accept a higher interest rate.

89.     Plaintiff Norman is, and at all relevant times was, a customer of Chase.  Since at least August 2004, Chase offered, and Mr. Norman accepted, three long term fixed rate loans, with fixed annual rates of 3.99 % and 4.99% until the balance is repaid in full.  The total principal amount of the long term fixed rate loans was approximately $19,500, for which Mr. Norman paid transaction fees of approximately $75 and $35 for two of the transactions.

90.    Plaintiff Norman accepted Chase's offer because it provided long-term certainty and thus allowed him to budget his monthly expenses for years to come.

91.    Mr. Norman has fully complied with his obligations under the long term fixed rate loan, including making timely minimum monthly payments.

92.    In January 2009, Mr. Norman discovered that the minimum payment on his loan had jumped from approximately $178 to approximately $438 (from 2% of the balance to 5%) and that Chase had assessed a $10 monthly finance fee. When Mr. Norman explained to Chase that he could not afford the increased minimum payment, Chase told him that his minimum payments could be put back to 2% and the monthly service fee could be waived if he accepted a higher interest rate of 7.99% until 2011, with an interest rate of Chase's choosing after that period. Finding the 7.99% interest rate unreasonable, Mr. Norman paid the higher minimum monthly payments rather than accept a higher interest rate.

93.    Plaintiff Kuramoto is, and at all relevant times was, a customer of Chase.  In or around 2007, Chase offered, and Mr. Kuramoto accepted, multiple long term fixed rate loans, with fixed annual rates of 2.99%, 3.99%, 4.99% and 5.99% until the balance is repaid in full.  The total principal amount of the long term fixed rate loans was approximately $44,654 for which Mr. Kuramoto paid a transaction fee of approximately $199 per transaction.

94.    Plaintiff Kuramoto accepted Chase's offer because it provided long-term certainty and thus allowed him to budget his monthly expenses for years to come.

95.    Mr. Kuramoto has fully complied with his obligations under the long term fixed rate loan, including making timely minimum monthly payments.

96.    In June 2009, Chase informed Mr. Kuramoto that the minimum payment on his loan had jumped in total from approximately $894 to approximately $2235 (from 2% of the balance to 5%).  When Mr. Kuramoto explained to Chase that he could not afford the increased minimum payment, Chase told him that he had three options: (1) pay off the balance entirely by transferring the loan to another lender and closing the account; (2) close his current account and participate in a "willingness and ability" program where his account's interest rate increases to 12% and the balance is paid off within five years; or (3) seek outside credit counseling.  Finding

these options unreasonable and unaffordable, Mr. Kuramoto is attempting to pay the higher monthly minimum payment.

97.    Plaintiff Francovig is, and at all relevant times was, a customer of Chase.  In or around 2008, Chase offered, and Ms. Francovig accepted, two long term fixed rate loans, with fixed annual rates of 2.99% and 3.99% until the balance is repaid in full.  The total principal amount of the long term fixed rate loans was approximately $8,400 for which Ms. Francovig paid two transaction fees of approximately $141 and $137.

98.    Plaintiff Francovig accepted Chase's offer because it provided long-term certainty and thus allowed her to budget her monthly expenses for years to come.

99.    Ms. Francovig has fully complied with her obligations under the long term fixed rate loan, including making timely minimum monthly payments.

100.    In or around June 2009, Chase informed Ms. Francovig that the minimum payment on her loans had jumped in total from approximately $140 to approximately $329 (from 2% of the balance to 5%).  When Ms. Francovig explained to Chase that she could not afford the increased minimum payment, Chase told her that she had no options other than to pay the increased minimum payment.  With no other options provided by Chase, Ms. Francovig is attempting to pay the higher monthly minimum payment.

101.    Plaintiff Neumann is, and at all relevant times was, a customer of Chase.  In or around March 2006, Chase offered, and Ms. Neumann accepted, a long term fixed rate loan, with a fixed annual rate of 3.99% until the balance is repaid in full.  The total principal amount of the long term fixed rate loan was approximately $13,000, for which Ms. Neumann paid a transaction fee.

102.    Plaintiff Neumann accepted Chase's offer because it provided long-term certainty and thus allowed her to budget her monthly expenses for years to come.

103.    Ms. Neumann has fully complied with her obligations under the long term fixed rate loan, including making timely minimum monthly payments.

104.    In or around 2009, Ms. Neumann discovered that the minimum payment on her loan had jumped from 2% of the balance to 5% and that Chase had assessed a $10 monthly

finance fee. Her minimum payment jumped from approximately $174 (2%) to $428 (5%) per month. When Ms. Neumann explained to Chase that she could not afford the increased minimum payment, Chase told her that her minimum payments could be put back to 2% and the monthly service fee could be waived if she accepted a higher interest rate of 7.99%. Finding the 7.99% interest rate unreasonable, Ms. Neumann paid the higher minimum monthly payments rather than accept a higher interest rate.

105.    Plaintiff Smolensky is, and at all relevant times was, a customer of Chase. In or around May 2005, Chase offered, and Ms. Smolensky accepted, two long term fixed rate loans, with fixed annual rates of 3.99% until the balance is repaid in full. The total principal amount of the long term fixed rate loans was approximately $19,800, for which Ms. Smolensky paid a transaction fee of approximately $65 per transaction.

106.    Plaintiff Smolensky accepted Chase's offer because it provided long-term certainty and thus allowed her to budget her monthly expenses for years to come.

107.    Ms. Smolensky has fully complied with her obligations under the long term fixed rate loan, including making timely minimum monthly payments.

108.    Upon receiving her March 2009 Statement, Chase informed Ms. Smolensky that the minimum payment on her loan had jumped from approximately $89 to approximately $220 (from 2% of the balance to 5%) and that Chase had assessed a $10 monthly finance fee. When Ms. Smolensky explained to Chase that she could not afford the increased minimum payment, Chase told her that her minimum payments could be put back to 2% and the monthly service fee could be waived if she accepted a higher interest rate of 7.99% until 2011 with an interest rate of Chase's choosing after that period. Finding the 7.99% interest rate unreasonable, Ms. Smolensky ultimately paid her balance in full by transferring her loan to another lender for a fee rather than accept a higher interest rate.

109.    Plaintiff Wilkinson is, and at all relevant times was, a customer of Chase. In or around 2005, Chase offered, and Lt. Wilkinson accepted, two long term fixed rate loans, with fixed annual rates of 4.99% and 5.99% until the balance is repaid in full. The total principal

amount of the long term fixed rate loans was approximately $34,900. Lt. Wilkinson paid a transaction fee of approximately $75.

110.    Plaintiff Wilkinson accepted Chase's offer because it provided long-term certainty and thus allowed him to budget his monthly expenses for years to come.

111.    Lt. Wilkinson has fully complied with his obligations under the long term fixed rate loan, including making timely minimum monthly payments.

112.    In or around June 2009, Chase informed Lt. Wilkinson that the minimum payment on his loan had jumped from approximately $448 to approximately $1120 (2% of the balance to 5%). When Lt. Wilkinson explained to Chase that he could not afford the increased minimum payment, Chase suggested that he should attempt to renegotiate his loan or cancel the card. Finding these options unreasonable, Lt. Wilkinson is attempting to pay the higher monthly minimum payment.

## CLASS ALLEGATIONS

113.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and others similarly situated (the "Class"), initially defined as:

> All persons or entities in the United States who entered into a loan agreement with Chase, whereby Chase promised a fixed APR until the loan balance was paid in full, but who have been charged, or notified by Chase that they will be required to make monthly minimum payments of 5% of their outstanding loan balance.

Additionally, solely for the purpose of TILA and certain state consumer protection statutes, the Class does not include business entities.

114.    The following persons shall be excluded from the Class: (1) Defendants and their subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediate family members thereof.

115.    Plaintiffs reserve the right to modify or amend the Class definition(s), as appropriate.

116.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

117.    **Numerosity Under Rule 23(a)(1).** The members of the Class are so numerous that individual joinder of all the members is impracticable.  Plaintiffs are informed and believe that there are, at least, thousands of Chase cardholders who have been damaged by Chase's conduct, as alleged herein.  The precise number of class members and their addresses are unknown to Plaintiffs; however, they are readily available from Chase's records.  Class members may be notified of the pendency of this action by mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

118.     **Commonality and Predominance Under Rule 23(a)(2) and (b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual class members, including, but not limited to, the following:

a.   Whether Plaintiffs and Class members accepted Chase's offer for, and paid consideration for, long term fixed rate loans;

b.   Whether Chase may unilaterally modify the terms of the long term fixed rate loans;

c.   Whether Chase breached its contract with Plaintiffs and members of the Class;

d.   Whether Chase breached the covenant of good faith and fair dealing with respect to Plaintiffs and members of the Class;

e.    Whether Chase violated the consumer protection statutes of the various states by, among other things, engaging in unfair, deceptive, fraudulent or unconscionable practices;

f.   Whether Chase's mandatory arbitration provision, class action ban and choice of law provisions are enforceable;

g.    Whether Chase has been unjustly enriched as a result of the conduct complained of herein;

h.   Whether, as alleged herein, Chase violated the Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.*;

        i.   Whether Class members are entitled to actual, statutory, or other forms of damages, and other monetary relief and, if so, in what amount; and

        j.   Whether Class members are entitled to equitable relief, including but not limited to injunctive relief and restitution.

119.    **Typicality Under Rule 23(a)(3).** The named Plaintiffs' claims are typical of the claims of the Class because, among other things, Plaintiffs accepted Chase's offer for, and paid consideration for, long term fixed rate loans; and, notwithstanding that Plaintiffs at all times honored the conditions of the long term fixed rate loans, Chase increased the minimum monthly payments.

120.    **Adequacy of Representation Under Rule 23(a)(4).** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class that they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

121.    **Superiority Under Rule 23(b)(3).** A class action is superior to all other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Chase, so it would be impracticable for the members of the Class to individually seek redress for Chase's wrongful conduct. Even if the members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

122.    **Risk of Inconsistent Adjudication Under Rule 23(b)(1)(A).** The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or

varying adjudication with respect to individual Class members, which would establish

incompatible standards of conduct for Chase.

123.    **Incompatible Standards of Conduct Under Rule 23(b)(1)(B).**  The prosecution

of separate actions by individual Class members would create a risk of adjudications that would,

as a practical matter, be dispositive of the interests of other Class members not parties to the

adjudications, or would substantially impair or impede their ability to protect their interests.

124.    **Declaratory and Injunctive Relief Under Rule 23(b)(2).**  Chase has acted or

refused to act on grounds generally applicable to the Class, thereby making appropriate final

injunctive relief with respect to the members of the Class as a whole.

125.    **Issue Certification Under Rule 23(c)(4).**  The claims of Class members are

comprised of common issues that are appropriate for certification under Rule 23(c)(4).

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

126.    Plaintiffs, on behalf of themselves and the Class, re-allege and incorporate by

reference each and every allegation set forth in the preceding paragraphs as though alleged in full

herein.

127.    Under common law, a covenant of good faith and fair dealing is implied into every

contract.

128.    Chase offered Plaintiffs and the Class fixed, long term loans "until [the] balance is

paid in full."  At the time the agreements were entered, the terms of the loans required that the

consumer make timely monthly minimum payments of 2% of the ending balance on their

monthly statement, and 2% was the industry standard.

129.    If the consumer failed to make minimum monthly payments on time, Chase

retained the right to terminate the terms of the loan and apply a higher APR to the remaining loan

balance.

130.     In November 2008 and June 2009, Chase mailed notices to customers carrying balances on such loans stating, in part, that Chase was unilaterally increasing the required minimum monthly payment by 150%,—i.e., from 2% to 5%.

131.     Chase's actions are intended to force Plaintiffs and Class members to (a) accept higher APR loans to maintain the 2% minimum payment requirement, (b) make a late payment and trigger a penalty APR—generally 29.99%—and late fees, and/or (c) pay off or transfer the loans to other available credit sources, thus shortening the life of what Chase views is an underperforming investment.

132.     Chase's actions to unilaterally reset the terms of what it perceived as underperforming loans violates the spirit of the agreements between Chase and Plaintiffs and the Class.  The increased minimum monthly payment benefits Chase and the investors of the securitized loans to the detriment of class members.  The amount of the increase was arbitrary and/or unreasonable and is intended to prevent, and has had the effect of preventing, Plaintiffs and the Class from receiving the benefits of the loan agreements.

133.     As such, Chase's conduct, including offering long term fixed rate loans while simultaneously retaining the right to unilaterally modify the material terms of those loans, violated the covenant of good faith and fair dealing implied in the loan agreements.

134.     Plaintiffs and members of the Class performed all of the significant duties required by their loan agreements with Chase prior to Chase's unilateral imposition of a change in terms.

135.     The conditions required for Chase's performance under the loan agreements had occurred.

136.     As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiffs and the Class sustained damages in an amount to be determined by this Court, including interest on all liquidated sums and reasonable attorneys' fees.  Plaintiffs also seek restitution and disgorgement of profits relating to the increased minimum payment and/or declaratory relief as may be appropriate.

**SECOND CLAIM FOR RELIEF**

**(Unconscionability)**

137.   Plaintiffs, on behalf of themselves and the Class, re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

138.   Chase's conduct, including offering long term fixed rate loans while simultaneously retaining the right to unilaterally modify the material terms of those loans, as reflected in the provisions in the November and June notices that increase account holders' required minimum monthly payments by 150%, are unfair and unconscionable.

139.   Plaintiffs and the Class have no meaningful choice with respect to Chase's election to change the minimum monthly payment term, and indeed Chase's notices did not provide account holders an opportunity to opt-out of the change in terms.  The change in terms is worse than one presented on a "take it or leave it basis" because the Plaintiff and the Class "took" the loans before Chase imposed the oppressive change in terms, and now Plaintiffs and Class members are confronted with lesser options, including avoiding the change by agreeing to pay Chase a higher APR on their loan balance or immediately paying down the account in full.

140.   The increased minimum payment requirement is unreasonably favorable to Chase and unduly harsh with respect to Plaintiffs and the Class, and therefore substantively unconscionable.  For example, an account holder with a $20,000 balance will see her required monthly payment increase from $400 to $1,000.  The increase is designed to result in penalty fees, default APRs, higher alternate offer APRs, and/or to force those account holders who are able to pay the entire amount to do so instead of maintaining the favorable APR.

141.   To the extent Chase has enforced these unconscionable provisions in the Cardmember Agreements, Plaintiffs and the Class sustained damages in an amount to be determined by this Court, including interest on all liquidated sums and reasonable attorneys' fees.  Plaintiffs also seek restitution and disgorgement of profits relating to the increased minimum payment and/or declaratory relief as may be appropriate.

**THIRD CLAIM FOR RELIEF**

**(Declaratory Relief)**

142.    Plaintiffs, on behalf of themselves and the Class, re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

143.    A dispute exists between Plaintiffs and the Class and Chase over Chase's increase of the minimum monthly payment term from 2% to 5%, its implementation of a $10 monthly finance charge, and the corresponding impact on Class members' APRs.

144.    Plaintiffs contend that Chase was not entitled to increase the APRs on Plaintiffs' and Class members' loans absent a default, or increase the minimum monthly payment terms on those loans from 2% to 5%, which Chase promised would remain fixed until the balance of the loan was paid in full.  To the extent Chase asserts the right to increase class member APRs absent a default, or increase their minimum monthly payments, Plaintiffs seek declaratory relief in the form of a finding that Chase has no such rights.

145.    Plaintiffs contend that Chase was not entitled to increase their required minimum monthly payment by 150% in the manner described above.  To the extent Chase asserts that it has discretion under the Cardmember Agreement or otherwise to increase the required minimum monthly payment, Plaintiffs seek declaratory relief in the form of a finding that Chase violated the covenant of good faith and fair dealing implied in the agreements, and imposed an unconscionable term in the loan agreements that is void and cannot be enforced.

146.    Plaintiffs contend that they did not agree to arbitration or to waive their rights to bring claims on behalf of a class.  To the extent Chase asserts that the claims of Plaintiffs and the Class *are* subject to an arbitration agreement or a class action waiver, Plaintiffs seek declaratory relief in the form of a finding that such a purported agreement is void and unenforceable as against public policy and/or unconscionable in at least the following respects:

        a.    To the extent Chase asserts that an arbitration agreement waives Plaintiffs' right to bring claims on behalf of the Class, such an arbitration agreement is unconscionable and unenforceable.

b.  To the extent any such waiver of class claims exists in an arbitration agreement, it removes the only practicable way for consumers to deter and redress the wrongs alleged in this Complaint, thus making such an arbitration agreement unconscionable and unenforceable.

c.  To the extent Chase asserts an arbitration agreement that is a consumer contract of adhesion presented to Plaintiffs and the Class in a take-it-or-leave-it manner, and Chase maintains superior bargaining over Plaintiffs and the Class, such an arbitration agreement is unconscionable and unenforceable.

d.  To the extent Chase asserts that its unilaterally imposed contractual terms can invalidate Rule 23 of the Federal Rules of Civil Procedure, such an agreement is unenforceable.

147.    Plaintiffs seek declaratory relief from this court in the form of an order addressing the conduct alleged herein.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment/Restitution)

148.    Plaintiffs, on behalf of themselves and the Class, re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

149.    By its deceptive, misleading, bad faith and unlawful conduct alleged herein, Chase unjustly received a benefit at the expense of Plaintiffs and Class members.

150.    It is unjust to allow Chase to retain the profits from its deceptive, misleading, bad faith and unlawful conduct alleged herein without providing compensation to Plaintiffs and the Class.

151.    Chase acted with conscious disregard for the rights of Plaintiffs and the Class.

152.    Plaintiffs and members of the Class are entitled to restitution of, disgorgement of, and/or the imposition of a constructive trust upon, all profits, benefits, and other compensation obtained by Chase from its deceptive, misleading, bad faith and unlawful conduct.

### FIFTH CLAIM FOR RELIEF

#### (Breach of Contract)

153.   Plaintiffs, on behalf of themselves and the Class, re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

154.   Chase offered hundreds of thousands of customers the opportunity to originally incur debt, or transfer the balances on loans held by other lenders, and Chase would consolidate the debt into a loan with a fixed APR that would apply "until the balance is paid off," unless the customer breached the agreement by, among other things, making a late payment.

155.   At the time Plaintiffs and Class members accepted Chase's offer its underlying loan agreements required that its customers make minimum payments of 2% of the ending balance on the monthly statement.

156.   Given their prior course of dealing with Chase and the established industry standard of a 2% minimum payment, Plaintiffs and Class members had a reasonable expectation that the minimum payment would be 2% for the life of the loan, and a reasonable expectation as to the cost of the Chase loan over the life of that loan, which included a minimum monthly payment of 2% of the ending balance of the monthly statement.  Chase was aware of these reasonable expectations.

157.   Plaintiffs and Class members had no reason to know that Chase was offering long term fixed rate loans while simultaneously retaining the right to unilaterally modify the material terms of those loans.

158.   Plaintiffs and Class members gave consideration that was fair and reasonable, and performed all conditions, covenants and promises required under their respective balance transfer loan agreements with Chase.

159.   As alleged herein, Chase breached its contractual promises by imposing monthly finance charges that effectively increased the APR, and by increasing the minimum monthly payments from 2% to 5%.

160.    By reason of Chase's breaches, Plaintiffs and Class members were or are subjected to higher APRs, forced to pay more to Chase in connection with their loans than they bargained for, and suffered damages in an amount to be proven at trial.

161.    Chase directly benefited from, and is being unjustly enriched by, the contractual breaches alleged herein.

162.    As a result, Plaintiffs and the Class sustained damages in an amount to be determined by this Court, including interest on all liquidated sums and reasonable attorneys' fees.

## SIXTH CLAIM FOR RELIEF

### (State Consumer Protection Statutes)

163.    Plaintiffs, on behalf of themselves and the Class, re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

164.    In the event the Court determines that the Delaware choice of law provision in Chase's cardholder agreements is unenforceable against non-residents, Plaintiffs allege that Chase's conduct, as set forth herein, violates the following consumer protection statutes:

k.   Ala. Code § 8-19-1, et seq.;

l.   Alaska Stat. § 45.50.471, et. seq.;

m. Ariz. Rev. Stat. § 44-1522, et. seq.;

n.   Ark. Code § 4-88-101, et. seq.;

o.   Cal. Bus. & Prof. Code § 17200, et. seq.;

p.   Colo. Rev. Stat. § 6-1-105, et. seq.;

q.   Conn. Gen. Stat. § 42-110a, et. seq.;

r.   6 Del. Code §§ 2511, et. seq. and 2531, et seq.;

s.   D.C. Code § 28-3901, et. seq.;

t.   Fla. Stat. § 501.201, et. seq.;

u.   Ga. Stat. §§10-1-372, et. seq., 10-1-392 and 10-1-420;

v.   Haw. Rev. Stat. § 480-1, et. seq.;

w.   Idaho Code § 48-601, et. seq.;

x.   815 ILCS § 505/1, et. seq.;

y.   Ind. Code Ann. § 24-5-0.5-1, et. seq.;

z.   Iowa Code § 714.16, et. seq.;

aa. Kan. Stat. § 50-623, et. seq.;

bb. Ky. Rev. Stat. § 367.170, et. seq.;

cc. La. Rev. Stat. § 51:1401, et. seq.;

dd. 5 Me. Rev. Stat. § 205A, et. seq.;

ee. Md. Com. Law Code § 13-101, et. seq.;

ff.  Mass. Gen. L. Ch. 93A, et. seq.;

gg. Mich. Comp. Laws Ann. § 445.901, et. seq.;

hh. Minn. Stat. §§ 325D.43, et seq., 325F.67, et seq.; and 325F.68 et seq.;

ii.  Miss. Code Ann. § 75-24-1, et. seq.;

jj.  Vernon's Ann. Missouri Stat. § 407.010, et. seq.;

kk. Mont. Code Ann. § 30-14-101, et. seq.;

ll.  Neb. Rev. Stat. § 59-1601, et. seq.;

mm.   Nev. Rev. Stat. Ann. § 598.0903, et. seq.;

nn. N.H. Rev. Stat. § 358-A:1, et. seq.;

oo. N.J. Rev. Stat. § 56:8-1, et. seq.;

pp. N.M. Stat. § 57-12-1, et. seq.;

qq. N.Y. Gen. Bus. Law §§ 349 et. seq. and 350-e, et seq.;

rr.  N.C. Gen. Stat. § 75-1.1, et. seq.;

ss.  N.D. Cent. CODE §§ 51-12-01, et. seq., and 51-15-01, et seq.;

tt.  Ohio Rev. Stat. § 1345.01, et. seq.;

uu. Okla. Stat. 15 § 751, et. seq.;

vv. Or. Rev. Stat. § 646.605, et. seq.;

ww.    73 Pa. Stat. § 201-1, et. seq.;

xx. R.I. Gen. Laws. § 6-13.1-1, et. seq.;

yy. S.C. Code Laws § 39-5-10, et. seq.;

zz. S.D. Codified Laws § 37-24-1, et. seq.;

aaa.    Tenn. Code § 47-18-101, et. seq.;

bbb.    Tex. Bus. & Com. Code § 17.41, et. seq.;

ccc.    Utah Code. § 13-11-1, et. seq.;

ddd.    9 Vt. § 2451, et. seq.;

eee.    Va. Code § 59.1-196, et. seq.;

fff. Wash. Rev. Code. § 19.86.010, et. seq.;

ggg.    West Virginia Code § 46A-6-101, et. seq.;

hhh.    Wis. Stat. §100.20, et. seq.; and

iii. Wyo. Stat. § 40-12-101, et. seq.

165.    As a result of Chase's violations of the foregoing state consumer protection statutes, Plaintiffs and Class members are entitled to compensatory damages, double damages, treble damages, statutory damages, punitive or exemplary damages, restitution, and/or injunctive relief.

### SEVENTH CLAIM FOR RELIEF

### (Truth In Lending Act, 15 U.S.C. § 1601 *et. seq.*)

166.    Plaintiffs, on behalf of themselves and the Class, re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

167.    Pursuant to TILA (15 U.S.C. § 1601 *et seq.*) and the regulations promulgated thereunder, Defendants were required to make certain "Initial Disclosures" in connection with Class member's check loans(s), setting forth, among other things, "the circumstances under which a finance charge will be imposed and an explanation of how it will be determined." 12 C.F.R. § 226.6.

168.    Beginning in approximately November 2008, Chase stated in its notice of change of terms that in January 2009, Defendants would begin assessing a $10 monthly finance charge in connection with each Class member's account.  This charge constitutes a "finance charge" under TILA, such that Defendants were required to disclose and explain it as part of its "Initial Disclosures" made in connection with the original promotional solicitation.  15 U.S.C. § 1605(a), 12 C.F.R. § 226.6.

169.    Chase failed to disclose the $10 monthly finance charge, or explain how it would be determined, in its Initial Disclosures, in violation of TILA.

170.    Chase's change in terms notice falsely states that, "Your APRs will not be impacted by these changes."  Additionally, Chase's periodic statements misstate the APR applicable to the purchase amount and to the promotional amount by attributing 100% of the $10 monthly finance charge solely to APR applicable to purchases, without regard to whether there were purchases made on the account or not.

171.    As a result of Chase's violations of TILA, Plaintiffs and Class members have been harmed and are entitled to injunctive relief and to recover actual damages, statutory damages and attorneys' fees, pursuant to 15 U.S.C. § 1640.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and the Class, request that the Court order relief and enter judgment against Chase as follows:

1. An order certifying the proposed Class and appointing Plaintiffs and counsel comprising Plaintiffs' Executive Committee to represent the Class;

2. An order that Chase be permanently enjoined from its improper and unlawful conduct and practices alleged herein;

3. A judgment awarding Plaintiffs and members of the Class actual damages in an amount according to proof for Chase's breaches of the loan agreements, and for all other of Chase's conduct alleged under all causes of action herein entitling Plaintiffs and members of the Class to actual damages;

4. A judgment awarding Plaintiffs and members of the Class restitution, including, without limitation, disgorgement of all profits and unjust enrichment obtained by Chase as a result of its unlawful, unfair, and fraudulent business practices and conduct alleged herein;

5. A judgment awarding Plaintiffs and members of the Class statutory damages under TILA;

6. A judgment awarding Plaintiffs and members of the Class exemplary damages for Chase's knowing, willful, and intentional conduct, as alleged herein;

7. Declaratory relief that any purported arbitration agreement between the Plaintiff and the Class and Chase is void and unenforceable.

8. Prejudgment and post-judgment interest;

9. Attorneys' fees, expenses, and the costs of this action; and

10. All other and further relief as the Court deems necessary, just and proper.

MASTER CLASS ACTION COMPLAINT
CASE NO. M:09-CV-02032 MMC

1

<u>**JURY DEMAND**</u>

2          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury for all

3    issues so triable under the law.

4

5    Dated: July 24, 2009

6                                        By:   _/s/ Elizabeth J. Cabraser_____
                                                Elizabeth J. Cabraser
7

8                                        Barry R. Himmelstein
                                         Michael W. Sobol
9                                        Roger N. Heller
                                         **LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
10                                       275 Battery Street, 30th Floor
                                         San Francisco, CA  94111-3336
11                                       Telephone:   (415) 956-1000
                                         Facsimile:    (415) 956-1008
12
                                         James C. Sturdevant
13                                       Monique Oliver
                                         Whitney Huston
14                                       **THE STURDEVANT LAW FIRM, P.C.**
                                         354 Pine Street, Fourth Floor
15                                       San Francisco, CA 94104
                                         Telephone: (415) 477-2410
16                                       Facsimile: (415) 477-2420

17                                       Oren S. Giskan
                                         Catherine E. Anderson
18                                       Jason L. Solotaroff
                                         **GISKAN SOLOTAROFF ANDERSON & STEWART
19                                        LLP**
                                         11 Broadway, Suite 10004
20                                       Telephone: (215) 847-8315
                                         Facsimile: 964-9645
21
                                         Robert S. Green
22                                       Charles D. Marshall
                                         **GREEN WELLING P.C.**
23                                       595 Market Street, Suite 2750
                                         San Francisco, CA 94105
24                                       Telephone: (415) 477-6700
                                         Facsimile: (415) 477-6710

25

26

27

28

- 34 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14  826904.2

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Eric H. Gibbs
Dylan Hughes
Geoffrey A. Munroe
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Jeff Westerman
Sabrina S. Kim
Andrew J. Sokolowski
**MILBERG LLP**
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, CA 90071
Telephone:  (213) 617-1200
Facsimile:  (213) 617-1975

*Plaintiffs' Executive Committee*

MASTER CLASS ACTION COMPLAINT
CASE NO. M:09-CV-02032 MMC